UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RODRICK TIMOTHY ROBINSON, *a.k.a.*
Timothy Rodrick Robinson,

                Plaintiff

v.

RAY SHOLTZ, LAURA MCCORMICK,
YOLANDA BUSH, STEVEN RIVARD,
MARK MCCULLICK, ROBERT VASHAW,
ROBERT STONE, SUSAN HAVELKA
and JOHN DOE(S),

                Defendants.

_____/

Case No. 2:17-cv-12675
District Judge Robert H. Cleland
Magistrate Judge Anthony P. Patti

**<u>REPORT AND RECOMMENDATION TO DENY DEFENDANTS SHOLTZ,
McCORMICK AND BUSH'S MOTION FOR SUMMARY JUDGMENT (DE
34) AND DISMISS THE JOHN DOE DEFENDANTS WITHOUT
PREJUDICE</u>**

**I.    RECOMMENDATION**: The Court should **DENY** Defendants Sholtz,

McCormick, and Bush's motion for summary judgment (DE 34) and dismiss the

John Doe Defendants without prejudice.

## II.    REPORT:

### A.    Background

Rodrick Timothy Robinson is currently incarcerated at the Michigan Department of Corrections (MDOC) Chippewa Correctional Facility (URF).[1]  On August 15, 2017, while incarcerated at the St. Louis Correctional Facility (SLF), Robinson filed a *pro se*, verified prisoner civil rights complaint against eight named Defendants:  (**1**) Ray Sholtz, (**2**) Laura McCormick, (**3**) Yolanda Bush, (**4**) Steven Rivard, (**5**) Mark McCullick, (**6**) Robert Vashaw, (**7**) Robert Stone, and (**8**) Susan Havelka.  (DE 1 at 5; *see also* DE 17.)  In addition, Plaintiff lists as defendants "Unit 2 Correctional Officers at St. Louis Correctional Facility working on [August 14, 2016] at approximately [10 a.m.][.]" (*Id.*)  The factual allegations underlying Plaintiff's claims begin with a June 8, 2016 grievance against Defendant Sholtz and continue with the August 14, 2016 theft of Plaintiff's personal property, an August 17, 2016 attack by another inmate, and the related August 25, 2016 hearing.  (DE 1 at 6, 8.)  Plaintiff seeks injunctive relief, in the form of transfer to another facility, and a jury trial "to deter future prisoner safety deprivation[,]" and "to reasonabl[y] reward [him] for the pain, suffering, and rights deprivation."  (DE 1 at 11.)

---

[1] *See* www.michigan.gov/corrections, "Offender Search," last visited May 23, 2019.

2

Judge Cleland referred this case to me for all pretrial matters.  On June 27, 2018, Defendants Mark McCullick, Robert Vashaw, Robert Stone, Susan Havelka and Steven Rivard were dismissed.  (DE 26.)  Plaintiff's claims against Defendants Sholtz, McCormick and Bush remain, as do those against the yet to be identified John Doe "Unit 2 Correctional Officers" at St. Louis Correctional Facility.  (*Id*.)[2]

## B.   Pending Dispositive Motion

Currently before the Court is Defendants Sholtz, McCormick, and Bush's motion for summary judgment.  (DE 34.)  Defendants concurrently filed two exhibits under seal:  **(1)** the Prison Rape Elimination Act (PREA) Investigation regarding the events of June 8, 2016 (DE 35); and, **(2)** a video of the August 17, 2016 altercation (DE 36).  (*See also* DE 40.)

Plaintiff filed a timely  response under the Prisoner Mailbox Rule.  (DEs 37, 41.)  *Houston v. Lack*, 487 U.S. 266, 270 (1988).  Although it is single-spaced, the Court will still consider it; however, Plaintiff is cautioned that future filings must

---

[2] As set forth in the Court's September 13, 2018 order setting deadlines, Plaintiff was to provide the name of "John Doe" Defendants by October 12, 2018.  (DE 28.)  By a letter postmarked March 12, 2019, after the close of discovery and well beyond the deadline for naming the John Doe Defendants, Plaintiff asked several questions of the Clerk's Office, including one about his efforts to identify the John Doe Corrections Officers.  (DE 38.)  However, Plaintiff's letter was promptly stricken from the record, as Court staff cannot give legal advice and letters are not proper filings.  (DE 39.)  Moreover, Plaintiff's other filings since the entry of the Court's order do not appear to identify the John Doe Defendants.  (*See* DE 29, 41.)  Thus, the Court should now dismiss the John Doe Defendants without prejudice.

comply with the formatting and type size requirements of E.D. Mich. LR 5.1

("Filing of Papers").

### C.    Standard

Under Federal Rule of Civil Procedure 56, "[t]he court shall grant summary

judgment if the movant shows that there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(a).  A fact is material if it might affect the outcome of the case under governing

law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  The Court

"views the evidence, all facts, and any inferences that may be drawn from the facts

in the light most favorable to the nonmoving party."  *Pure Tech Sys., Inc. v. Mt.*

*Hawley Ins. Co.*, 95 F. App'x 132, 135 (6th Cir. 2004) (citation omitted).

"The moving party has the initial burden of proving that no genuine issue of

material fact exists . . . ."  *Stansberry v. Air Wis. Airlines Corp.*, 651 F.3d 482, 486

(6th Cir. 2011) (internal quotations omitted); *cf.* Fed. R. Civ. P. 56 (e)(2)

(providing that if a party "fails to properly address another party's assertion of fact

. . . [,]" then the court may "consider the fact undisputed for the purposes of the

motion[.]").  "Once the moving party satisfies its burden, 'the burden shifts to the

nonmoving party to set forth specific facts showing a triable issue.'"  *Wrench LLC*

*v. Taco Bell Corp.*, 256 F.3d 446, 453 (6th Cir. 2001) (quoting *Matsushita Elec.*

*Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  The nonmoving

party must "make an affirmative showing with proper evidence in order to defeat the motion." *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009) (citation omitted); *see also Metro. Gov't of Nashville & Davidson Cnty.*, 432 F. App'x 435, 441 (6th Cir. 2011) ("The nonmovant must, however, do more than simply show that there is some metaphysical doubt as to the material facts . . . .   [T]here must be evidence upon which a reasonable jury could return a verdict in favor of the non-moving party to create a genuine dispute.") (internal quotation marks and citations omitted).

Summary judgment is appropriate if the evidence favoring the nonmoving party is merely colorable or is not significantly probative.  *City Management Corp. v. United States Chem. Co.*, 43 F.3d 244, 254 (6th Cir. 1994).  In other words, summary judgment is appropriate when "a motion for summary judgment is properly made and supported and the nonmoving party fails to respond with a showing sufficient to establish an essential element of its case[.]"  *Stansberry*, 651 F.3d at 486 (referencing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986)).

The fact that Plaintiff is *pro se* does not lessen his or her obligations under Rule 56.  Rather, "[t]he liberal treatment of *pro se* pleadings does not require lenient treatment of substantive law, and the liberal standards that apply at the pleading stage do not apply after a case has progressed to the summary judgment stage." *Johnson v. Stewart*, No. 08-1521, 2010 WL 8738105, at *3 (6th Cir. May

5, 2010) (internal citations omitted).  The Sixth Circuit has made clear that, when

opposing summary judgment, a party cannot rely on allegations or denials in

unsworn filings and that a party's "status as a *pro se* litigant does not alter [this]

duty on a summary judgment motion."  *Viergutz v. Lucent Techs., Inc.*, 375 F.

App'x 482, 485 (6th Cir. 2010) (emphasis added); *see also United States v. Brown*,

7 F. App'x 353, 354 (6th Cir. 2001) (affirming grant of summary judgment against

a *pro se* plaintiff because he "failed to present any evidence to defeat the

government's motion").

### D.    Discussion

#### 1.    The record contains evidence of events that precede the scope of Plaintiff's complaint but provide helpful background.

##### a.    The December 2015 Class I Misconduct for Smuggling

In December 2015, Inspector Vashaw issued Plaintiff a misconduct report

for smuggling.  (DE 41 at 11.)  On January 13, 2016, Plaintiff was put in

administrative segregation for an inability to be managed with general population

privileges.  (DE 41 at 16, 45, 47.)

It seems that, on February 11, 2016, Plaintiff received a "30 day

continuance" in administrative segregation.  (DE 41 at 13.)  On February 14,

2016, Plaintiff sought reconsideration of this decision and a "second chance to be

housed in ge[ne]ral population."  (DE 41 at 13-14.)  By way of a March 9, 2016

6

segregation behavior review, Inspector Vashaw and Warden Rivard recommended reclassification to general population.  (DE 41 at 16.)

> **b.      Plaintiff's May and June 2016 Kites to Defendant McCormick regarding Defendant Scholtz**

On May 19, 2016, Plaintiff wrote to McCormick seeking assistance with C/O Sholtz and noting the "fear of other inmates joining in the torment."  (DE 41 at 59.)  Plaintiff again wrote to McCormick on June 2, 2016, wherein he requested a separation or protective custody from C/O Sholtz and stated that "C/O Sholtz has exposed me as a homosexual and thus put my life in danger.  I need protection from C/O Sholtz and other gang members[.]"  (DE 41 at 60.)  (*See also* DE 41 at 66 ¶¶ 3-6.)

> **2.      The factual allegations underlying Plaintiff's complaint begin on June 8, 2016 and continue through August 1, 2017.**

> **a.      The June 2016 Grievance against Defendant Sholtz (SLF-16-06-0579-17a)**

On June 8, 2016, Plaintiff completed a grievance regarding Defendant Sholtz.  (DE 1 at 6.)  SLF-16-06-0579-17a was received at Step I on June 15, 2016. (DE 34-2 at 2.)  In particular, the grievance states:

> On the above date at approx[imately] 1205 hours, lunch was being served in G-Unit and I approached the tray serving line[,] at which time C/O Scholtz ordered me to "get my tray and lock-down."  I told C/O Scholtz why do I gotta eat in my cell and I didn't do anything to warrant his order.  C/O Scholtz told me to stop speaking and lock my "fagot" ass down or he'll send me to the box.  I followed orders and filed this grievance.  I would like it duly noted that I've previously

7

> informed RUM McCormick of C/O Scholtz's abusive, threatening,
> and degrad[ing] comments and his discrimination, ordering me to eat
> in the cell. . . . I have no current or pending tickets that would justify
> C/O Scholtz's orders, which he has been ordering me to eat in my cell
> for over a month. Also, C/O Scholtz's use of the word "fagot" in
> reference to me was highly disrespectful, unprofessional, degrading,
> and humiliating. In direct conflict with MDOC PREA. Also, I feel
> very afraid of reprisal from C/O Scholtz. He is very unpredictable
> and has threatened my saf[et]y.

(*Id.*) (*See also* DE 41 at 66 ¶ 7.)

Plaintiff attests that, in response to his grievance, he spoke with McCormick

and "showed her the kite I rec[ei]ved from gang members and Defendant

Sholt[z's] continued behavior and my need of protection." (DE 41 at 66 ¶ 8.) It

appears that ARUS L. McCormick responded to the grievance on June 29, 2016.

This was reviewed by RUM Havelka. (DE 34-2 at 2-4, DE 41 at 27-28.) Among

other things, McCormick wrote:

> I explained to C/O Sholtz instead of making Robinson eat in his cell if
> he is disruptive he should use the disciplinary process instead of
> making him eat in his cell. I do not find any evidence of any policy
> violation on behalf of C/O Sholtz.

(DE 34-2 at 3, DE 41 at 27.)[3] Nevertheless, in response to the instant dispositive

motion, Plaintiff seems to argue that Defendant Sholtz's actions contradict MDOC

---

[3] This response bears the Grievance Identifier SLF-16-05-0448-07a, rather than
SLF-16-06-0579-17a. (DE 34-2 at 3.) However, the Court assumes this is a
typographical error, as the text of the response discusses the alleged events of June
8, 2016.

policy, perhaps a reference to MDOC PD 03.03.105 ("Prisoner Discipline").  (DE 41 at 4.)

On July 8, 2016, Plaintiff completed a Step II grievance appeal, which was received at Step II on July 11, 2016, in which he stated:

> It is true I've notified staff of C/O Sholtz behavior, but this behavior has been occurring since May of 2016.  It wasn't till after I notified [s]taff of C/O Sholtz behavior that he called me a 'fagot[,]' [which] is a homosexual slur[.]  C/O Sholtz has been ordering me to eat in my cell since May.  C/O Sholtz has also been creating an uncomfortable and hostile environment amongst [my]self and inmates by directly telling inmates that I am a snitch and not [to] associate with me because he'll 'boat' them up for hanging with 'fags'.  This [be]havior is affecting my reh[a]bil[i]tation and saf[et]y as inmates tend to target homosexuals in prison.  C/O Sholtz, I feel, is attempting to endanger my life.

(DE 34-2 at 5.)[4]  On July 13, 2016, Warden Rivard responded, in part:

"Investigation at Step II revealed that due to the nature of the alleged comment by Officer Sholtz, this grievance is being referred to Inspector Vashaw (PREA Investigator) for further investigation."  (DE 34-2 at 7.)[5]

---

[4] ARUS Bush interviewed Plaintiff on July 12, 2016, although it is not clear to the Court whether the interview was in preparation for Warden Rivard's Step II grievance response.  (DE 34-9 at 2 ¶ 3; *see also* DE 41 at 3, DE 41 at 66 ¶ 9.) According to L. McCormick, Plaintiff left Unit 6 that same day.  (DE 34-5 at 7, DE 41 at 30.)

[5] On the same date, SLF-16-07-18063-PREA-P was initiated.  The form, signed by both Inspector Vashaw and Plaintiff, notifies Plaintiff that his allegations "have been forwarded to Lt. Shaw for investigation in accordance with" certain MDOC policy directives.  (DE 24 at 7.)  Plaintiff and prisoner Arthur Williams each completed questionnaires on July 25, 2016.  (DE 41 at 19-20.)  Without violating

Plaintiff completed a Step III grievance appeal.  (DE 18-3 at 13.)  On September 26, 2016, Plaintiff's attempt to file it appeal was returned with the directions that Plaintiff needed to include the Step I response, or give a valid reason why it could not be included, and that Plaintiff needed to include "a legible reason for appeal to Step III."  (DE 18-3 at 18, 6.)  Plaintiff's Step III grievance appeal was received at Step III on October 10, 2016.  (DE 34-2 at 8.)[6]  It was decided on October 24, 2016.  (*Id*.)  (*See also* DE 1 at 6.)

### b.    Meanwhile, Plaintiff feared for his safety.

Plaintiff claims that, during his grievance-related interview(s), he provided "witnesses to C/O Sholtz's actions," and noted his "fear of violence due to anonymous 'kites' [he] would randomly [receive] under [his] cell door from gangs ordering payments for protection from attacks."  (DE 1 at 6; *see also* DE 41 at 39.)  Plaintiff contends that, without Defendant Sholtz's actions, "calling me a fag and

---

the sensitive nature of the sealed PREA Investigation, the Court notes Lt. E. Shaw's August 14, 2016 conclusion that there was "Insufficient Evidence to support the allegation made by Prisoner Robinson."  (DE 35 at 4-6, DE 41 at 23-25; *see also* DE 41 at 21-22 [Allegations, Investigations, Personnel Actions System (AIPAS) Incident Summary].)  It appears that Inspector Vashaw informed Plaintiff of this finding on or about August 26, 2016.  (DE 35 at 12-14.)

[6] On or about October 19, 2016, while Plaintiff awaited the Step III grievance response, Defendant McCormick noted that Plaintiff refused to sign an MDOC SLF Protective Custody Waiver.  (DE 34-7 at 2, DE 41 at 53.)  Plaintiff contends that he "never refused protective custody by Defendant McCormick[,]" and he "was never offered . . . protective custody by Defendant McCormick or any other prison staff members."  (DE 41 at 67 ¶ 19.)

eventually a rat or snitch," the gang members "would not have participated in those activities." (DE 41 at 5.) Plaintiff also claims to have "personally showed Defendants Bush and McCormick the kite [he] rec[ei]ved from gang members requesting money and threat[e]ning [his] life[.]" (DE 41 at 5, 39.)[7]

Through numerous interviews and kites − including June 27th, July 19th and 30th, and August 13, 2016 − Plaintiff claims to have "notified staff of [his] fears and the reasons for [his] fears." (DE 1 at 7; *see also* DE 41 at 5, 61-64.)

In his response to the instant dispositive motion, Plaintiff states that he met with Defendant Bush "for a routine job classification screen[,]" at which time he asked her if she had received any of his kites, and Defendant Bush responded, "Yes, I got them, but you sound like the problem. Causin' all this confusion!" (DE 41 at 3.)

### c.    The August 14, 2016 theft

Plaintiff claims that, on August 14, 2016, Unit 2 Corrections Officers allowed an inmate into Plaintiff's cell, and the inmate "stole over $200 worth of . . . personal property." (DE 1 at 6; *see also* DE 41 at 66 ¶ 11.) Plaintiff explains that he reported this information to Defendant Bush and wrote a grievance, presumably SLF-16-09-0946-19F. (DE 41 at 4, 32 and 67 ¶ 13.) ARUS Y. Bush responded on

---

[7] With respect to the allegation of being publicly outed as a homosexual, the Court's attention is drawn to Sealed Exhibit 2. (DE 35 at 6.)

September 13, 2016, noting, among other things, that the TV was recovered and turned over to ARUS Walworth on September 12, 2016.  (DE 41 at 33.) Apparently referring to McCullick's September 27, 2016 Step II grievance response, which characterized Plaintiff's Step II grievance appeal as seeking transfer "to another facility for his safety[,]" (*see* DE 18-3 at 37-38), Plaintiff alleges that he "tried to be transferred or placed in segregation."  (DE 1 at 7.)

According to Plaintiff, the theft was captured on video footage, and Defendant Sholtz "admitted to 'some' procedural violations, but denied others with regard to the prisoner grievance response."  (DE 1 at 6.)  Plaintiff filed a claim for personal losses.  (DE 41 at 34-37.)

### d.  The August 17, 2016 altercation

Plaintiff alleges that, on August 17, 2016, he was "attacked by another inmate[,]" who Plaintiff has since identified as McKnight, "a known gang member[.]"  (DE 1 at 6, DE 41 at 4, DE 41 at 67 ¶ 14.)  Video of this altercation has been filed under seal.  (DE 36.)

As one might expect, the parties have different opinions regarding this incident.  In the aftermath of the altercation, Plaintiff claimed, *inter alia*:  **(i)** to "have notified C/O Hendershot, ARUS Bush, C/O Lutz, Warden McCullick, and RUM McCormick about pending issues with gang members and [his] options as far as saf[et]y[;]" **(ii)** that he "was not the aggressor[;]" and, **(iii)** that he "only

defended [him]self from the fo[r]ward attacks of inmate McKnight." (DE 34-5 at 5.) Also, in response to the instant motion, Plaintiff claims that Knight "used the same verb[i]age as Defendant Sholtz towards me saying 'fag and snitch.[']" (DE 41 at 67 ¶ 14; *see also* DE 41 at 4, 67 ¶ 20.)

However, in support of their dispositive motion, Defendants contend that "Plaintiff can be seen in a mutual fight, making no attempt to flee or quash the incident." (DE 34 at 13.)

### e. The August 25, 2019 misconduct hearing

Plaintiff was issued a misconduct report for fighting, to which he pleaded not guilty. (DE 34-5 at 2-4, 7; *see also* DE 41 at 30, 41, 43.) On August 19, 2016, Hearing Investigator L. Scott performed a misconduct sanction screening assessment, which noted that Plaintiff was "being confined in temporary segregation pending misconduct hearing." (DE 34-5 at 15.) From August 18, 2016 to August 22, 2016, Deputy McCullick, ARUS McCormick, Officer Hendershot and ARUS Bush answered questionnaires, while C/O Lutz and S. Thomas provided memoranda. (DE 34-5 at 6-7, 10-13.)

On August 25, 2016, a hearing was held, at which point Plaintiff "notified staff of the events leading up to the attack and the reason relayed to [him] by the inmate as to why he was attacking [Plaintiff] and that the events w[ould] continue as long as [Plaintiff is] at [SLF]." (DE 1 at 6.) Hearing Officer W. Groat found

Plaintiff guilty and assessed 10 days of detention and 15 days loss of privileges. (DE 34-5 at 2, DE 41 at 41.)  In doing so, he noted Plaintiff's claim that "this was gang related," and it would "happen again if put back on the yard."  (*Id*.)  Still, the hearing officer found that Plaintiff "was not the initial aggressor[,]" and "was reacting to an attack[,]" and yet found that "his self-defense claim lacks merit[,]" and "this incident was a fight."  (*Id*.)  On August 31, 2016, Plaintiff was classified to administrative segregation for an "inability to be managed with [general population] privileges[.]"  (DE 34-6 at 2, DE 41 at 45, 47.)

## f.    The September 28, 2016 Segregation Behavior Review

In a September 28, 2016 segregation behavior review, Vashaw and Stone recommended reclassification to general population, which appears to have been approved the following day by McCullick.  (DE 34-6 at 2, DE 41 at 45.)  This seems to be the "security classification committee hearing" to which Plaintiff refers in his complaint.  (DE 1 at 9.)

Apparently referring to the September 28, 2016 decision, Plaintiff explains that this release to the general population occurred "d[e]spite [his] protection request."  (DE 41 at 67 ¶ 15.)  Moreover, Plaintiff contends that he "was housed in the same area as the pri[s]oners who attacked [him] and who prison staff had recently discovered to be in possession of a prison made knife."  (DE 41 at 67 ¶

16.)  In addition, Plaintiff states that he was released to "the housing unit with Defendant Sholtz[.]"  (DE 41 at 4, DE 41 at 45.)[8]

### g.      Plaintiff's housing as of August 1, 2017

Plaintiff alleges that, as of August 1, 2017, he was in the same housing unit in which Defendant Sholtz regularly works, and Sholtz "still makes inappropriate and offensive comments towards" him.  (DE 1 at 9.)  He also claims to be in the same housing unit as the inmate who attacked him.  (*Id.*)

### 3.      Plaintiff seeks "a safe environment . . . ."

Plaintiff filed the instant lawsuit on August 15, 2017.  He alleges that evidence in his possession and in SLF files supports "the numerous attempts to notify SLF Administration of the targeting by C/O Sholtz and inmates due to C/O Sholtz['s] comments."  (DE 1 at 8.)  In Plaintiff's own words, this lawsuit "is solely based upon the deliberate deprivation by SLF Administration to ensure a safe enviro[n]ment by *systematically* ignoring, den[y]ing, and neglecting such . . . ."  (DE 1 at 10 (emphasis added).)

---

[8] It appears that, on February 27, 2017, SLF staff "were contacted by an outside police agency conducting an investigation regarding a letter sent by Robinson to an individual in which Robinson asks the individual to assist in smuggling marijuana and heroin into the facility."  (DE 41 at 47.)  Plaintiff was classified to administrative segregation on March 15, 2017, purportedly for an inability to be managed with general population privileges, and, on May 18, 2017, staff recommended reclassification to the general population.  (*Id.*)  Here, too, Plaintiff suggests that he was released to "the housing unit with Defendant Sholtz[.]"  (DE 41 at 4, DE 41 at 47.)

Based on multiple case citations, it is clear that Plaintiff's causes of action against Defendants are based upon an alleged failure to protect.  (*See* DE 1 at 8-10.)  In particular, Plaintiff claims that:

- **Defendant Sholtz** violated MDOC PD 03.03.130 ("Humane Treatment And Living Conditions For Prisoners"), as described in a grievance – presumably SLF-16-06-0579-17a, which was initiated on June 8, 2016 (DE 34-2 at 2, DE 41 at 18).

- **Defendant McCormick** had been notified of Defendant Sholtz's "inappropriate behavior" and of the threatening "kites" he was receiving.

- **Unit 2 guards** deliberately opened Plaintiff's cell door (presumably on August 14, 2016) and aided and abetted "in the felon[i]ous theft of [his] personal property worth more than $200."

- He "sent 3 kites to ARUS **[Defendant] Bush**," which the Court assumes are those dated July 19, July 30, and August 13 (DE 41 at 62-64), and, during an interview, presumably in July 2016 (DE 34-9 at 2 ¶ 3, DE 41 at 66 ¶ 9), "notified her of 'all' events leading up to the attack by another inmate[,]" as well as Plaintiff's "fear of persistence by gang members of threats and extortion orders."

- He and ARUS Walworth, as well as **McCullick, Stone, Vashaw, Defendant McCormick and Havelka**, were allegedly in attendance at a Security Classification Committee (SCC) hearing – presumably the one that took place on September 28, 2016 (DE 34-6 at 2, DE 41 at 45) – at which Plaintiff was "placed back in general population . . . [,]" despite Plaintiff's protest and "notification to them of all events leading up to [that point] and [his] concerns for the future."

(DE 1 at 8-10.)

Plaintiff contends that Defendant Sholtz's comments initiated a chain reaction, which included:  **(a)** inmates hearing the comments; **(b)** Plaintiff's receipt of threatening "kites;" **(c)** the theft of his property, aided − or at least permitted − by SLF staff; and **(d)** an attack by a gang member.  (DE 1 at 10; *see also* DE 41 at 6.)  Plaintiff is concerned for his safety and sexual privacy.  (DE 1 at 9-10.)[9]

> ### 4.   Whether there is a "genuine dispute as to any material fact" as to Plaintiff's claims against Defendants Sholtz, McCormick and Bush?

> #### a.   Failure to protect

"A prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment."  *Farmer v. Brennan*, 511 U.S. 825, 828 (1994).  However, "a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  *Farmer*, 511 U.S. at 837.  "But an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of

---

[9] Plaintiff has provided evidence of a grievance(s) he initiated in September 2017 regarding the events of September 22, 2017.  (DE 41 at 49-51; *see also* DE 41 at 4.)  However, such events post-date the August 15, 2017 initiation of the instant lawsuit.

punishment." *Id*. at 838.  "[A]n Eighth Amendment claimant need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Id*. at 842.

"One does not have to await the consummation of threatened injury to obtain preventive relief.  If the injury is certainly impending, that is enough." *Commonwealth of Pennsylvania v. State of W. Virginia*, 262 U.S. 553, 593, *aff'd sub nom. Com. of Pennsylvania v. State of W. Virginia*, 263 U.S. 350 (1923).  "It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause, whether that conduct occurs in connection with establishing conditions of confinement, supplying medical needs, or restoring official control over a tumultuous cellblock." *Whitley v. Albers*, 475 U.S. 312, 319 (1986).  "*Some* conditions of confinement may establish an Eighth Amendment violation 'in combination' when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise—for example, a low cell temperature at night combined with a failure to issue blankets." *Wilson v. Seiter*, 501 U.S. 294, 304 (1991) (emphasis in original).

### b.    Knowledge of a threat to Plaintiff's safety

Defendants argue that "Plaintiff is unable to prove [his] claim of failure to protect," as "he cannot show that Defendants Sholtz, McCormick or Bush had any knowledge of his safety being threatened." (DE 34 at 12.)

Specifically, Defendants argue that "they were never informed that Plaintiff felt threatened by any individual in the prison." (DE 34 at 12.) To support their "denial of having knowledge of any threats[,]" they cite affidavits, wherein:

- Sholtz and Bush each attest that "Robinson never made any requests to me for protection. I never received any kites from Robinson informing me of his fear of being harmed nor did I ever have any knowledge that Robinson receive[d] threats from any individual." (DE 34-4 at 3 ¶ 7, DE 34-9 at 3 ¶ 6.)

- McCormick attests that "Robinson never provided me with any information that had to do with any individuals whom he feared or felt that his safety was in danger form [sic]. If he had I would have told him, he could go to segregation for a protection request investigation. He never requested protection at that time. At no time did I receive any kites from Robinson indicating he felt he was in danger or being threatened." (DE 34-8 at 3 ¶ 5.)

- McCormick also attests that "Robinson never made any requests to me for protection. I never received any kites from Robinson informing me of his fear of being harmed nor did I ever have any knowledge that Robinson receive threats from any individual." (DE 34-8 at 3 ¶ 7.)

- Bush attests that Plaintiff did not "mention fear of persistence by gang members or threats and extortion" during the July 12, 2016 interview. (DE 34-9 at 2 ¶ 3.)

- Bush also attests that, "[a]t no time did I receive any kites from Robinson . . . indicating he felt he was in danger or being threatened." (DE 34-9 at 3 ¶ 4.)

- Bush further attests that "[i]f Robinson . . . had informed me that he feared for his safety, I would have told him he could go to segregation for a protection request investigation." (DE 34-9 at 3 ¶ 5.)

(DE 34 at 13.)

Although Defendants argue that Plaintiff "will be unable to produce any legitimate document showing a complaint or fear of a threat that was produced to Defendant Sholtz, McCormick or Bush prior to his fight on August 17, 2016[,]" (DE 34 at 12-13), Plaintiff responds with copies of six documents, comprised of notes to McCormick on dated May 19, June 2, and June 27, 2016, and notes to Bush on July 19, July 30, and August 13, 2016, each of which concerns Sholtz and/or concern for Plaintiff's safety. (DE 41 at 59-64.) The kites are generally referenced, both in Plaintiff's unsigned response and in Plaintiff's notarized affidavit. (*See*, *e.g.*, DE 41 at 3, 5, 6; DE 41 at 66-67 ¶¶ 5, 9, 10, 17.)[10] Additionally, Plaintiff attests that he "will testify under oath and penalty of the law that all of the allegations in this suit are exact and true to the best of [his] knowledge." (DE 41 at 67 ¶ 18.) These notes seriously call into question

---

[10] *See* Fed. R. Civ. P. 11(a) ("Every pleading, written motion, and other paper must be signed by at least one attorney of record in the attorney's name--or by a party personally if the party is unrepresented. The paper must state the signer's address, e-mail address, and telephone number.").

Defendants' assertion that the August 25, 2016 misconduct hearing, at which time Plaintiff "made self-serving statements of self-defense . . . [,]" was "the first mention of a threat." (DE 34 at 13, DE 34-5 at 2.) Indeed, Defendants have not filed a reply. As such, there is a genuine dispute as to the material fact of Defendants' knowledge of a threat to Plaintiff's safety prior to the August 17, 2016 altercation.

Defendants make much of Plaintiff's request to be placed in general population, request to be released from segregation, and refusal of segregation, apparently relying upon: **(i)** Plaintiff's February 14, 2016 request for reconsideration of his February 11, 2016 classification hearing (DE 34-5 at 6, 8-9); and, **(ii)** the October 19, 2016 protective custody waiver, which reflects that Plaintiff "did not want to go to segregation for [protective custody] [and] then stated he didn't want to make a decision at this time[,]" (DE 34-7 at 2). (DE 34 at 13.) However, in response, Plaintiff correctly observes that the February 14, 2016 letter "was written well before the incidents with Defendant Sholtz began." (DE 41 at 4.) Also, Plaintiff attests that he "never refused protective custody by Defendant McCormick and [he] was never offered . . . protective custody by Defendant McCormick or any other prison staff members." (DE 41 at 67 ¶ 19.) Thus, to the extent Defendants are challenging Plaintiff's credibility, he has challenged *theirs*.

### c.   Qualified immunity

Defendants also argue that they "are entitled to qualified immunity," because "a rational trier of fact would not conclude in this case that Defendants committed a clearly established constitutional violation against the Plaintiff." (DE 34 at 14-16.)

"[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Toward analyzing a party's entitlement to qualified immunity, the Supreme Court has noted: "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity. On the other hand, if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Several years later, the Supreme Court further honed the qualified immunity analysis, providing that "[t]he judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the

circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

The crux of Defendants' qualified immunity argument is that "neither Defendant Sholtz, McCormick nor Bush had any knowledge that Plaintiff's safety was being threatened[,]" and that "Defendants did not have the culpable state of mind to purposefully ignore Plaintiff's safety complaints." (DE 34 at 16.) As such, they are not really advancing an argument that they are entitled to the *defense* of qualified immunity; rather, they are rehashing their argument that Plaintiff has not shown that Defendants had knowledge of a threat to his safety, *i.e.*, that Plaintiff cannot establish an *element* of the underlying failure to protect *cause of action*. As explained above, the Undersigned disagrees. Plaintiff has proffered sufficient evidence demonstrating a genuine factual dispute on the issue of notice.

### E.    Conclusion

For the reasons stated above, the Court should **DENY** Defendants Sholtz, McCormick, and Bush's motion for summary judgment. (DE 34.) The Court should also now dismiss the John Doe Defendants without prejudice, as the deadline for naming them has long come and gone, discovery has closed, and Plaintiff has had more than enough time to discover their identities.

## III.  PROCEDURE ON OBJECTIONS:

The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within 14 days of service, as provided for in Fed. R. Civ. P. 72(b)(2) and E.D. Mich. LR 72.1(d).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1981).  Filing objections that raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1273 (6th Cir. 1987).  Pursuant to Local Rule 72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," and "Objection No. 2," *etc.*  Any objection must recite precisely the provision of this Report and Recommendation to which it pertains.  Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity.  Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d).  The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to

Objection No. 2," *etc.*  If the Court determines that any objections are without

merit, it may rule without awaiting the response.

Dated: May 31, 2019                    s/*Anthony P. Patti*                    
                                       Anthony P. Patti
                                       UNITED STATES MAGISTRATE JUDGE

## Certificate of Service

I hereby certify that a copy of the foregoing document was sent to parties of record
on May 31, 2019, electronically and/or by U.S. Mail.

                                       s/Michael Williams                    
                                       Case Manager for the
                                       Honorable Anthony P. Patti